## Case No. 7,733.

### KERR v. SOUTH PARK COMMISSIONERS et al.

[8 Biss. 276; 6 Reporter, 548; 11 Chi. Leg. News, 17.] [1]

Circuit Court, N. D. Illinois. Sept., 1878.

PLURIES EXECUTION — IRREGULARITY — SALE OF HOMESTEAD UNDER EXECUTION — EXTENT OF HOMESTEAD—LOT—SALE EN MASSE — ABANDONMENT OF HOMESTEAD — WIFE'S INTENTIONS AND DECLARATIONS.

1. A levy and sale of lands under a pluries execution when a prior levy under the same judgment remained undisposed of, instead of issuing a venditioni exponas, is at most a mere irregularity which can only be taken advantage of in apt time.

2. In Illinois the sale of property, while occupied as a homestead, by virtue of an execution and levy is void, and it makes no difference whether the premises are worth more or less than the $1,000 allowed as the limit in value of the homestead.

3. But in giving construction to the term "lot" as used in the homestead law, the court will confine it to the forty acre tract, according to governmental survey, upon which the residence of the debtor is situated.

4. If the sheriff sells as one tract two forty acre pieces of land, one of which is the homestead, the sale will be set aside as to the entire eighty acres.

5. In determining whether there has been an abandonment of the homestead, regard must be had as well to the purposes and declarations of the wife, as of the husband, and where there is an intention or desire on the part of the wife to return, the right of homestead may not be lost, even though the husband did not intend to return.

This case involved the title to about 196 acres in the South Park of Chicago. It presented several important questions under the execution and homestead statutes of Illinois. Defendant Charles B. Phillips became the owner in fee of this land about the year 1849. All parties claim under him, as a common source of title. Dec. 18, 1858 [William P.] Kerr, in an action of assumpsit, instituted in the superior court of Chicago, recovered a judgment against Phillips for the sum of $6,410.78. Dec. 31, 1858, execution issued upon that judgment, and was levied upon all right, title and interest which Phillips had in the land, upon which, at that time, he resided with his family. The property was advertised for sale, but by order of plaintiff's attorney, the sale was waived, and the execution returned. April 25, 1859, for want of bidders. Jan. 7, 1859, a warranty deed from Phillips to Daniel S. Sweeney, of New York, for this land was put upon record. It bears date

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 6 Reporter, 548, contains only a partial report.]

prior to Kerr's judgment, to-wit: Oct. 5, 1858, appears to have been acknowledged on the 4th of January, 1859, and states the consideration to be $20,000. Feb. 5, 1859, a deed for the land from Phillips and wife to Sweeney was put upon record. It is dated Oct. 5, 1858, was acknowledged by Phillips on the 4th of January, 1859, and by Mrs. Phillips Feb. 5, 1859. Consideration $20,000. April 18, 1859, a deed for the land from Sweeney to Thomas Wright, Sr., (the father of Mrs. Phillips) was recorded. It is dated Dec. 4, 1858, and was acknowledged Jan. 4, 1859. Consideration $9,000. Dec. 14, 1859, an alias execution issued upon Kerr's judgment, and was levied upon Phillips' interest in the land, which was duly advertised for sale, but no bids were offered, and the execution, by order of plaintiff's attorney, was returned without further proceedings thereunder. Jan. 5, 1862, the dwelling house, in which Phillips lived with his family, upon this land, was destroyed by fire. His family remained in the neighborhood for a short time, and then went to the residence of Mrs. Phillips' father, in the state of Ohio, remaining there for many years. The dwelling house was insured for $3,000, and the furniture at $500. The insurance was taken out in the name of Phillips, as agent of Thomas Wright. Some dispute arose as to whether Wright or Phillips was entitled to the insurance money. The company declined to pay more than $1,900. The parties finally reached an understanding, the result of which was that Phillips received about $1,000 of the $1,900, and the remainder was paid to Wright. Jan. 13, 1862, upon the occasion of the settlement about the insurance money, Wright and Phillips entered into a written agreement by the terms of which Wright, upon the performance of certain covenants and undertakings by Phillips, agreed to convey the land in controversy to Phillips, free and clear from all incumbrances whatsoever. June 2, 1863, Wright and Phillips had some settlement in reference to their business, resulting in a written indorsement, signed by both, upon the contract of Jan. 13, 1862, as follows: "All the transactions named, and all other transactions, whether within named, or not so named, between said Wright and said Phillips, from the beginning of the world to this day, are declared to be canceled and settled, and each party doth hereby release, acquit and discharge the other from, and of. all debts, claims, and demands, covenants, promises, acts, neglects, commissions and commission of every name and kind, at and prior to the date hereof." June 5, 1863, a deed from Wright and wife to Martin, was recorded, dated Jan. 1, 1863 (about the date of settlement between Wright and Phillips), acknowledged June 2, 1863, and reciting a consideration of $20,000. June 18, 1863, a pluries execution was issued upon Kerr's judgment of Dec. 18, 1858, and levied the same day upon Phillips' right, title and interest in this land. Under this levy a sale at

public vendue was had on the 17th of July, 1863, when Kerr became the purchaser of all the land except twenty-six acres, at the sum of $5,800; and on the 13th of August, 1863, he became the purchaser, at public sale, of that twenty-six acres, at the sum of $2,561.86. Subsequently, on Dec. 16, 1864, Kerr received the sheriff's deed for all the land thus purchased at public sale. Dec. 15, 1863, a deed from Martin to Charles P. Burton, dated May 7, 1863, acknowledged May 21, 1863—consideration $65—was put upon record. Of none of the foregoing deeds did Kerr have any knowledge until after they were recorded. Feb. 23, 1864, Phillips, in a suit instituted by him in the superior court of Chicago, against Kerr, to recover damages for an alleged violation of a contract in reference to certain lands in Johnson county, sued out an attachment, and the same was levied upon the land in controversy, as the property of Kerr. He obtained judgment, upon publication, and by default, against Kerr for $7,052. Under that judgment this land was sold and struck off to "Charles P. Burton." Another piece of the land was sold under the same judgment, of which Mixer became the purchaser. Nov. 1, 1864, Phillips brought a second attachment suit against Kerr, and the land was again levied on as the property of Kerr. In the latter case Kerr pleaded non est factum to the contract sued on, and that suit was subsequently dismissed at plaintiff's costs. It should be observed that during the year 1864, Phillips, by a decree rendered in an Indiana court, obtained a decree of divorce from his wife, without notice to her in any form of the pendency of such action. Feb. 17, 1865, Kerr sued in equity in the superior court, asserting that the contract sued on by Phillips was a forgery, and seeking to enjoin the judgment in the first attachment suit. Mixer made default, but Phillips defended. A final decree was rendered on Sept. 20, 1865, declaring the agreement sued on, a forgery, setting the judgment and sale aside, and granting a perpetual injunction. May 1, 1865, while the last named action was pending, Phillips professing to act as attorney for "Charles P. Burton," made a lease of the land in controversy to Levi Blackwell, who took possession thereunder. In August, 1866, Kerr sued Blackwell and "Burton" in ejectment, in the superior court in Chicago, to recover possession of the land. There was no actual service of process upon "Burton," but Blackwell was served. He made default, and judgment against him was taken on the 3d of September, 1866, and Kerr was put into possession. September 2, 1868, a motion was made in the ejectment suit in the name of "Charles P. Burton" for a new trial. Among the affidavits filed in support of this motion was one by Phillips, who represented himself as agent and attorney for Charles P. Burton, and stating that Burton was a resident of California. He recites in his affidavit the various conveyances above referred to, including the one from Martin to Burton in May, 1863, at which time he claims to have surrendered possession to Burton. An order was entered granting a new trial, but upon the same day a motion was entered, in behalf of Kerr, to set aside that order, on the ground that it had been obtained by fraud. On the 10th of December, 1869, the order granting a new trial was set aside and the original judgment ordered to stand.

On August 31, 1868, Mrs. Phillips entered into the first of several agreements with Charles H. Atkins. That between Mrs. Phillips and Atkins of August 31, 1868, recites the recovery of judgment by Kerr against Phillips, the sale under execution, purchase by Kerr, and sheriff's deed; that Mrs. Phillips claims homestead and right of dower in the premises; that Burton, who claims title against Kerr, has conveyed to Atkins the half section, less the north one hundred and three acres, for the purpose of aiding to set aside the sheriff's sale, in consideration of which, Atkins agrees to use his best endeavors to have Kerr's title set aside, to employ counsel and institute suits, and conduct the proceedings at his own expense; and in the event of success, and establishing his title to the half section less the north one hundred and three acres, he is to pay her $500, and convey to her an undivided five acres, and she to release to him all claim to the balance of the half section, including homestead and dower; she to execute all necessary papers and render all reasonable assistance. A second agreement, made November 26, 1868, between Atkins and Thomas Wright, father of Mrs. Phillips, recites the former agreement; that Mrs. Phillips has become dissatisfied with it; substitutes an undivided ten acres in lieu of five, to be conveyed to Mrs. Phillips, she to be paid $500; and then provides that if Mrs. Phillips can recover against Charles B. Phillips as much as twenty-five acres out of the north half, for alimony, she shall surrender all claim to any portion of the south half. Wright and Mrs. Phillips to do nothing to the injury of Atkins' title, nor embarrass him in any way in the conduct of the litigation, but are to render him all possible aid in the conduct of the litigation to recover the land from Kerr. On January 2, 1869, another agreement was made between Mrs. Phillips and Atkins. It recites the first agreement and the provision that Mrs. Phillips is to receive ten acres upon recovering the land from Kerr, leaves out the contingency in regard to the recovery of alimony from Phillips; requires Mrs. Phillips and Wright to render all necessary aid in their power to recover the land from Kerr, Atkins to pay all expenses of litigation. Phillips seemed to have co-operated in this movement, and professing to act as attorney for Burton, made a deed of the land to Atkins in 1868. On the same day Mrs. Phillips made a deed of the property to Atkins. And on the same day Atkins conveyed back to Phillips "in

trust for Burton" the north one hundred and three acres of the half section. The record shows various other deeds after the transaction with Atkins. May 3, 1869, Phillips, attorney in fact for "Burton," conveyed the north one hundred and three acres to Georgia P. Clark. She, on May 8, 1869, conveyed the land back to Phillips "for the benefit of Burton." June 18, 1869, Phillips conveyed to his brother, John Phillips, reciting Atkins' delinquency in not performing his agreement to clear the title. "Burton," the same day, by Phillips, as attorney in fact, quit claimed to John Phillips. July 1, 1870, John Phillips quit claimed to the South Park commissioners for $1. July 20, 1870, Charles B. Phillips made a like conveyance to the South Park commissioners, and March 20, 1870, David A. Martin quit claimed to the commissioners; consideration, $250. The general object of this suit by Kerr was to obtain a decree establishing his right against all of the defendants, to the entire tract of 196 acres.

F. H. Kales, Lyman Trumbull, and M. W. Fuller, for South Park commissioners.

Robert Rae and D. K. McRae, for Mrs. Phillips.

W. C. Goudy, S. B. Gookins, J. C. Dunlevy, and H. S. Monroe, for W. P. Kerr.

HARLAN, Circuit Justice (orally, after stating the facts). Numerous questions have been presented by counsel in elaborate oral and written arguments, characterized by very great ability. The court does not deem it necessary to express its opinion upon each of those questions, since its conclusions upon some of them seem to be sufficient to dispose of the case.

First—It is claimed by defendants that no right was acquired by the levy of June 18, 1863, under the pluries execution, nor by the sale under that levy, because there had been a levy, under a previous execution, for the same debt, which last levy remained undisposed of, when the execution of June 18, 1863, was issued.

Assuming that the levy made under the execution of December 14, 1859, was not waived by the order of plaintiff's attorney to return it without further proceedings, and conceding, as must be done, that the proper and regular mode to give effect to the levy under that execution, was to issue a venditioni exponas and not a pluries execution, the court is not prepared, in view of the authorities and what seems to be the settled practice in this state, to say that a subsequent levy and sale under the pluries execution, issued upon the same judgment, and levied upon the same property, for the same debt, was void.

The issuing of the pluries execution should rather be considered as a waiver of any rights acquired by the levy under the former execution. It was, at most, a mere irregularity to issue the pluries execution rather than a vend. ex., but advantage of that irregular-

ity should have been taken (if it could have been taken at all,) in apt time. The subsequent conduct of Phillips in the attachment and other suits heretofore referred to, in connection with the long delay in urging such objections, estops him and all claiming under him from urging such an objection in this litigation.

Second, the most important and difficult questions before the court are those which arise under or in connection with the homestead act of this state. On behalf of the defendants it is claimed that when the levy was made under the execution of June 18, 1863, as well as when the sales took place thereunder, the land in controversy, the entire tract of one hundred and ninety-six acres, was the homestead of Phillips, and wholly exempt from levy and forced sale under execution or other judicial process; that, consequently, the sale was in all respects void, conferring no right upon Kerr which he can assert in this suit, against Phillips or against Mrs. Phillips, or against any one holding title under them.

It is necessary here to examine the provisions of the homestead statute, and ascertain the settled construction of its provisions by the supreme court of Illinois, when the rights here in controversy, accrued. Whatever that construction has been, it will be the pleasure, as it is the duty, of this court to give it effect in this case.

By the first section of that act it is declared that "in addition to the property now exempt by law from sale under execution, there shall be exempt from levy and forced sale, under any process or order from any court of law or equity in this state, for debts contracted from and after July 4, 1851, the lot of ground and the buildings thereon, occupied as a residence, and owned by the debtor, being a householder, and having a family, to the value of $1,000." "Such exemption," it is provided, "shall continue after the death of the householder for the benefit of the widow and family, some or one of them continuing to occupy such homestead, until the youngest child shall become twenty-one years of age, and until the death of such widow; and no release or waiver of such exemption shall be valid unless the same shall be in writing, subscribed by such householder and his wife, if he have one, and acknowledged in the same manner as conveyances of real estate are by law required to be acknowledged." St. Ill. (Gross) 1871, c. 48a, § 1.

Other sections of the homestead law are as follows:

"Sec. 2. Exceptions. But no property shall, by virtue of this act, be exempt from sale for non-payment of taxes or assessments, or for a debt or liability incurred for the purchase or improvement thereof.

"Sec. 3. Valuation or Division by a Jury. If, in the opinion of the creditors or officer holding an execution against such household-

er, the premises claimed by him or her, as exempt, are worth more than $1,000, such officer shall summon six qualified jurors of his county, who shall, upon oath to be administered to them by the officer, appraise said premises, and if, in their opinion, the property may be divided without injury to the interest of the parties, they shall set off so much of said premises, including the dwelling house, as in their opinion shall be worth $1,000, and the residue of said premises may be advertised and sold by such officer.

"Sec. 4. In case the value of the premises shall, in the opinion of the jury, be worth more than $1,000, and cannot be divided, as is provided for in this act, they shall make and sign an appraisal of the value thereof, and deliver the same to the officer, who shall deliver a copy thereof to the execution debtor, or to some one of the family of suitable age to understand the nature thereof, with a notice thereto attached, that unless the execution debtor shall pay to the said officer the surplus over and above the $1,000, on the amount due on said execution within sixty days thereafter, that such premises will be sold.

"Sec. 5. Sale—How Made. In case such surplus, or the amount due on said execution, shall not be paid within the said sixty days, it shall be lawful for the officer to advertise and sell the said premises, and out of the proceeds of such sale to pay such execution debtor, the said sum of $1,000, which shall be exempt from execution for one year thereafter, and apply the balance on such execution: provided, that no sale shall be made unless a greater sum than $1,000, shall be bid therefor; in which case the officer may return the execution for want of property."

"Sec. 8. Whenever the dwelling house, or the building occupied as a homestead, and under the laws of this state exempt from execution and forced sale, shall have been insured by the person entitled to the benefit of such exemption, and a loss by fire or otherwise, shall occur in such manner as to entitle the person insured, to the benefit of such insurance, or any part thereof, the insurance company or companies liable for such loss, shall pay the same directly to the owner of such house or building, notwithstanding the service of garnishee process, or proceedings by creditor's bill, or otherwise, on the part of creditors of the insured; and the claim and demand of the insured against such insurance company or companies, shall be exempt from execution, attachment, garnishee process, or other proceeding on the part of creditors of the insured, to the same extent as the property so insured and destroyed, or injured, was exempt therefrom: provided, that nothing herein contained shall be construed to exempt more than $1,000, due on any insurance as aforesaid, from liabilities to attachment or other proceedings on the part of creditors." St. Ill. (Gross) 1871, c. 48a.

Numerous decisions have been rendered by the supreme court of Illinois, in which this homestead act has been construed. In Hartwell v. McDonald, 69 Ill. 293, that court, in reviewing its former decisions, said that it had uniformly held: "That a judgment is not a lien upon homestead premises. That the owner may sell or mortgage the same, free from the lien of the judgment, and that no liability can attach to the lands in the hands of the purchaser, for the previous judgment debt of his grantor. That the property is neither subject to a lien, a levy, or a forced sale, under judicial process while occupied as a homestead. That it does not vary the result whether the premises are worth more or less than $1,000, that if not worth more than that sum, the sale is prohibited by the statute, and if worth more, then none of the requirements of the statute having been observed in making the levy and sale, the sale is unauthorized."

The court then proceed to say: "The sales referred to being, of course, such as are made without regard to the provisions of the act, as was the sale in this case, property thus situated is held not to be liable to levy and sale on execution, and such sales of it are held to be inoperative and void, and that the purchaser acquires no title thereunder."

It cannot be doubted that when Kerr obtained his judgment against Phillips, the latter had a homestead right in this land. It was at that time, and until the destruction of his dwelling house in January, 1862, owned and occupied as a residence for himself and family. Whether that homestead right extended to the whole tract of 196 acres, or only to a part thereof, will be hereafter considered. For the present, we only say that, so far as he had a homestead in the land, it was exempt from levy and forced sale. That homestead right was subject to such disposition as he, in connection with his wife, chose to make of it, free from any lien of Kerr's judgment. So far as that right was concerned, it is immaterial what was the consideration upon which Phillips made and caused to be made the several deeds referred to.

Third. We come now to inquire whether this homestead right, at the time of Kerr's judgment, extended to the whole 196 acres. Upon a careful examination of all the decisions of the supreme court of this state, to which counsel have called attention, the court is of opinion that the homestead exemption did not extend beyond the forty-acre lot upon which the dwelling house of Phillips stood, when it was destroyed by fire. It is "the lot of ground and the buildings thereon, occupied as a residence, and owned by the debtor," which the statute exempts from levy and forced sale. In determining the extent of the homestead right, it is sometimes important to inquire how much, at the time, is claimed by the house-

holder. It is often, if not always, a question of fact, how much of a particular body of land can be fairly said to belong to the homestead; that is, to "the lot of ground" occupied as a residence. In Hill v. Bacon, 43 Ill. 478, it was decided that the court will take judicial notice that a quarter section of land is made up of four forties, each with well defined bounds. In that case, the forty-acre part of the quarter section upon which the residence and improvements stood, was declared to be a "lot" within the meaning of the homestead act. That case was reaffirmed in Linton v. Quimby, 57 Ill. 272. In the case of Gardner v. Eberhart, 82 Ill. 320, the court said that a farm may consist of several "lots of ground," within the meaning of the homestead act, but the statute exempts only the lot occupied as a residence.

The court in that case said: "It will take judicial notice of the government surveys of the public lands, and that a quarter section of land consists of four forties, each with well defined bounds. If the forty on which the resident buildings are situate does not exceed $1,000, in value, it is exempt." Of this construction of the law the execution creditor in this case cannot complain. The doubt the court has, is whether the homestead exemption might not also be extended to the forty acre lot over part of which the garden extended. But under all the facts and circumstances proven, the court is of opinion that the letter and spirit of the law is best satisfied by holding that the forty acre lot upon which the residence stood was altogether exempt from levy and sale under the homestead statute, and that its sale under Kerr's judgment was inoperative and void, unless, at the time of the levy and sale under the execution of June 18, 1863, the homestead right had been lost by abandonment. The established doctrine of the Illinois court seems to be that the homestead right may be lost by abandonment; such appears to be the rule as announced in these cases: Titman v. Moore, 43 Ill. 169; Maher v. McConaga, 47 Ill. 392; Vasey v. Board of Trustees, 59 Ill. 191; Wright v. Dunning, 46 Ill. 274; Howard v. Logan, 81 Ill. 386; Potts v. Davenport, 79 Ill. 458.

Upon examining these and other adjudged cases it will be found that the decision turns largely upon the special circumstances of each case. The general rule, however, is laid down that abandonment exists when the facts show the absence of the animus revertendi. When the family once leaves the homestead and lives elsewhere, some of the cases hold that the evidence of a purpose to return must be clear and definite. Some of the cases recognize the homestead right, although the dwelling has been destroyed by fire. The right to rebuild and re-occupy as a residence is recognized, if the purpose to do so in good faith exists.

But none of the cases prescribe any definite time within which return must take place. In some of the cases as much as two years expired after leaving the homestead premises without the homestead right of exemption being lost by abandonment. In this case the dwelling house of Phillips was consumed by fire in January, 1862. Without detailing the circumstances under which it was destroyed, it is sufficient to say that there is persuasive evidence to justify the conclusion that after the fire it was the purpose of Phillips to so conduct himself as to force his wife to leave him, whereby he could the better carry out his purpose to obtain a divorce. That his wife went to her father's, in Ohio, from absolute necessity, resulting from the failure of her husband to make proper provision for her, the evidence does not permit the court to doubt. She remained there as long as she did, from the same necessity, caused by the same neglect and failure. That from the very day of the fire she desired to return to her home near Chicago, and have the dwelling house rebuilt upon the same spot, is quite clear.

Her letters and her conduct clearly establish that her desire in that direction was known to all of her friends and to Phillips, and, as some of the evidence shows, to the agents of Kerr, if not to Kerr himself.

The homestead law was designed for the benefit of the wife and children as well as for the husband. In some of the cases it is declared that the husband as the head of the family, having the legal power, as such, to control the movements and residence of his family, may abandon the homestead so as to deprive the wife and children of the beneficent provisions of the statute. But such general expressions must be construed in reference to the facts of the particular cases in which they occur. They cannot be applied to a case like this without defeating one of the very objects of the homestead statute, which was to provide a shelter for wives and children, and thereby erect barriers against the increase of vagrancy and pauperism. Here the husband evidently had no purpose to return to the old homestead, or again to live with his family after they left Chicago for Ohio, where a temporary home had been offered by the wife's father. The court is forced by the evidence to the conclusion that Phillips did not desire his wife to return to him or to the homestead, because that might interfere with his plans in reference to the land. But, in determining whether the homestead right had been abandoned at the time of levy and sale, the court must not look alone to the purposes of the husband, or solely to his declarations. Some regard must be had to the purposes and declarations of the wife, to whom the statute secured rights in the homestead. The abandonment of her by her husband made her in some sense the head of the family, with the right to entertain independent purposes in regard to the homestead. Looking at all the evidence, and to the con-

duct of the parties, the fair conclusion is, that the homestead right, which unquestionably existed in the forty acre lot referred to, at the date of Kerr's judgment, and at the time of the fire, had not been lost by abandonment at the time of the levy and sale under which Kerr claims. Consequently the sale of that much of the one hundred and ninety-six acres was in violation of the statute.

The fact that Phillips received a part of the money paid by the insurance company should not be allowed, under the evidence in this case, to defeat the claim of homestead exemption. It is not clear that it was paid to, or received by Phillips as insurance money to which he was legally entitled. Upon the face of the policy it all belonged to Wright. He alone could demand it of the company. The reasons which induced him to divide the insurance money do not clearly appear. Besides, it is doubtful whether a large portion of the $1,000 received by Phillips did not cover the insurance upon the furniture in the house when it was destroyed. We are not satisfied that the statute about insurance of the homestead has, under the evidence, any application to the case.

Fourth. We come. now, to inquire as to the sale of the remaining portion of the 196 acres. From the facts detailed and from what has been said, it will be seen that the questions as to the remaining portion of the 196 acres involve considerations of a different character. This part of the case is somewhat complicated, because of the numerous deeds which Phillips made and caused to be made, after Kerr sued him in 1858. The deeds from Phillips to Sweeney, from Sweeney to Wright, from Wright to Martin and from Martin to Burton, were all fraudulent contrivances upon the part of Phillips, to hinder and delay Kerr, and perhaps other creditors. Of that the court has no doubt. No consideration passed from Sweeney to Martin. Wright had a claim against Phillips of small amount. but the object of Phillips in placing the title in him and afterward in Martin, was that the property might be held for him, and that he might the more readily evade the demands of creditors. As to "Burton," he seems to have been in one sense a myth. The evidence satisfies the court that it was. a name conveniently used by Phillips, without the knowledge of Burton, if there was such a person, for the purpose of concealing his plans and movements touching the property in controversy. The conveyance from Martin to Burton is to be deemed as a conveyance to Phillips by the name of Burton. These views are strengthened by the subsequent conduct of Phillips in having the property attached as Kerr's property, and by his efforts to set aside the judgment in the ejectment suit, using the name of Burton. when no such person existed. Wherever the name of Burton appears in any deed, power of attorney, or judicial proceeding, it must be regarded as meaning Charles B. Phillips. In view of these facts, it is clear that all these conveyances, made prior to the levy and sale under Kerr's execution, so far as they covered property other than the homestead, were void as to Kerr. He had the right, even had he known of these conveyances, to disregard them totally, and have the sale of the property outside of the homestead proceed without reference to them. They were valid only so far as they covered the exempted homestead, the right to which remained at the time of the levy and sale, although the title to the land was placed in others for Phillips' use and benefit.

The sale of the land other than the forty-acre homestead, was, therefore, in accordance with the statute. The exemption of that part from levy and sale did not prevent the creditor from levying upon and selling the other portions of the one hundred and ninety-six acres. Such a sale did not violate the debtor's statutory right of exemption, as will be seen by reference to the cases of Gardner v. Eberhart, 82 Ill. 321; Hill v. Bacon, 43 Ill. 478; Linton v. Quimby, 57 Ill. 272.

Kerr. by his execution sale, acquired a good title to all except the forty-acre homestead tract, and is entitled to relief to that extent. His counsel will prepare the necessary decree, and after showing it to counsel for defendants will present it to the court for examination.

NOTE. A petition for rehearing was subsequently filed, calling attention to the fact that the forty acres, upon which the residence stood, and which had been adjudged to be the homestead lot, was sold by the sheriff, in connection with the forty acres immediately north of it, those two tracts of forty acres each being sold as one tract of eighty acres, for $1,500. The court. upon the authority of Linton v. Quimby, 57 Ill. 273, modified its former ruling, and held that the execution sale was void as to this entire eighty acres. A decree to that effect was entered. Both sides appealed to the supreme court of the United States. which, at the October term 1881. affirmed the decree below. The affirmance being by a divided court. [For subsequent litigation involving the same subject matter and between the same parties, see 13 Fed. 502; 117 U. S. 379–388; 6 Sup. Ct. 801, 805.]